# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 24, 2007        Decided December 11, 2007

No. 06-5261

JOHN W. MUNSELL, ET AL.,
APPELLANTS/CROSS-APPELLEES

v.

DEPARTMENT OF AGRICULTURE, ET AL.,
APPELLEES/CROSS-APPELLANTS

———

Consolidated with
06-5262

———

Appeals from the United States District Court
for the District of Columbia
(No. 04cv01745)

———

*Thad M. Guyer* argued the cause and filed the briefs for
appellants/cross-appellees. *Joanne Royce* entered an
appearance.

*Alisa B. Klein*, Attorney, U.S. Department of Justice, argued
the cause for appellees/cross-appellants. With her on the briefs
were *Peter D. Keisler*, Assistant Attorney General, *Jeffrey A.
Taylor*, U.S. Attorney, *Jonathan F. Cohn*, Deputy Assistant
Attorney General, and *Mark B. Stern*, Attorney.

Before: GINSBURG, *Chief Judge*, GARLAND, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*:   In October 2004, appellants, Montana Quality Foods and Processing, Inc. and its president John W. Munsell ("Munsell/MQF"), filed a lawsuit in District Court against the Department of Agriculture ("USDA"), the Secretary of Agriculture in his official capacity, and Nathaniel Clark, who was then the District Office Manager of USDA's Food Safety and Inspection Service ("FSIS") in Minneapolis, Minnesota, in his personal capacity. Munsell/MQF claimed that FSIS officials used USDA enforcement powers to retaliate against Munsell for statements he made concerning USDA's handling of an *E. coli* outbreak in 2002. In August 2005, appellants filed an amended complaint, adding as a plaintiff the American Association of Meat Processors ("AAMP"), a trade association representing small meat processors that are subject to USDA inspection and oversight. Munsell/MQF, on their own behalf, and AAMP, on behalf of its association members, each sought declaratory and injunctive relief, presumably under the Administrative Procedure Act ("APA"), challenging a USDA enforcement Directive and seeking protection from future acts of retaliation by FSIS officials. Munsell/MQF also sought a money damages remedy under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), on the grounds that Munsell's First Amendment rights were violated when agency officials retaliated against him.

In 2005, during the course of the litigation in the District Court, Munsell sold all of MQF's meat processing facilities, thereby eliminating all of MQF's business operations that were subject to USDA regulation and oversight. The Government filed a motion to dismiss, challenging appellants' standing,

claiming that the action by Munsell/MQF was moot, and asserting that the entire action should be dismissed because appellants had failed to exhaust their administrative remedies. The District Court declined to rule on standing and mootness and instead granted the motion to dismiss on exhaustion grounds. The District Court first held that the governing statutory exhaustion requirement under 7 U.S.C. § 6912(e) is jurisdictional. The District Court then determined that appellants had failed to exhaust the applicable administrative appeal procedure prescribed by 9 C.F.R. § 306.5, concluded that the court lacked subject matter jurisdiction, and dismissed all of appellants' APA claims. The District Court also found that Munsell/MQF's *Bivens* action was barred due to their failure to exhaust administrative remedies. *Munsell. v. Sec'y of Agric.*, 435 F. Supp. 2d 149 (D.D.C. 2006). Munsell/MQF and AAMP appealed the District Court's dismissal, and the Government parties cross-appealed on standing and mootness. Guided by the Supreme Court's decision in *Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006), and other relevant precedent, we hold that 7 U.S.C. § 6912(e) does not impose a *jurisdictional* exhaustion requirement. We therefore conclude that the District Court erred in holding that plaintiffs' failure to exhaust their administrative remedies deprived the court of subject matter jurisdiction.

We affirm the judgment in favor of appellees on different grounds, however. First, we affirm the dismissal of Munsell/MQF's claims for injunctive and declaratory relief on standing and mootness grounds. Second, we affirm the dismissal of Munsell/MQF's *Bivens* action, because, even assuming that such an action might lie against USDA officials, Munsell/MQF failed to exhaust their administrative remedies before seeking judicial relief on their constitutional claims. Third, we dismiss for want of standing AAMP's action seeking protection for its members from future acts of retaliation by USDA, and dismiss AAMP's claims on behalf of Munsell/MQF as moot. Finally, although we find that the action filed by

AAMP challenging USDA's enforcement Directive on behalf of its members is not moot and it does not fail for want of standing or exhaustion, we affirm the dismissal of AAMP's action for injunctive and declaratory relief because it is unripe for judicial review.

## I. BACKGROUND

Congress enacted the Federal Meat Inspection Act in 1907 in response to unsanitary conditions in the nation's meat packing industry. The purpose of the Act is to assure that meat and meat food products are "wholesome, not adulterated, and properly marked, labeled, and packaged." 21 U.S.C. § 602. The Act directs USDA to inspect the sanitary conditions of meat processing plants and to "prescribe the rules and regulations of sanitation under which these establishments [are] maintained." *Id.* § 608. The Act grants the Secretary authority to "make such rules and regulations as are necessary for the efficient execution" of the Act. *Id.* § 621.

In 1996, USDA's FSIS issued a final rule requiring all meat processing plants to develop and implement controls to address food safety hazards that are likely to occur in their operation. *See* 61 Fed. Reg. 38,806 (July 25, 1996). This regulation is known as Hazard Analysis and Critical Control Point ("HACCP"). *See* 9 C.F.R. pt. 417. Under HACCP, plants are given considerable flexibility to design plans that achieve the ends of preventing food safety hazards. *See id.* § 417.2. FSIS inspectors evaluate plants' hazard prevention through direct observation and testing, and by examining plants' records. *See id.* § 417.8.

There are a range of enforcement actions that FSIS may take, including withholding the mark of inspection from meat products or suspending the assignment of inspectors to a plant. *See* 9 C.F.R. pt. 500. Without USDA approval, a meat processing plant is effectively expelled from the marketplace.

These enforcement actions can be financially ruinous, especially for smaller firms.

FSIS actions regulating meat processors may be appealed administratively. *Id.* §§ 500.5(c)-(e). Enforcement actions that are not held "in abeyance" can be appealed through a formal hearing process. *Id.* § 500.5(d). However, when an enforcement action is held in abeyance, administrative appeals must be made to the "immediate supervisor" of the official making the enforcement determination. *Id.* §§ 306.5, 500.5(c).

Munsell's family first started operating a meat processing plant in Montana in 1946. Am. Compl. ¶ 14, Joint Appendix ("JA") 19. During the time frame relevant to this case, the processing plant was incorporated in the name of MQF, with Munsell as MQF's chief executive officer and owner. MQF's meat processing business typically bought ten-pound lots of coarse ground beef ("chubs") from larger meat suppliers and further processed the beef for sale to individual consumers. *Id.* ¶ 15, JA 19. The plant was subject to inspection and regulation by USDA under the Federal Meat Inspection Act.

For a time preceding the events leading to this litigation, Munsell had been displeased with USDA's oversight of MQF's meat processing operation. In September 2001, he urged agency officials to adopt two procedural changes that he believed would protect small meat processors from economic harm resulting from contamination at large meat facilities. In particular, Munsell suggested the segregation of large plant meat products and the creation of a record of source beef to facilitate the traceback of adulterated meat to contamination in large plants. *Id.* ¶ 30, JA 24. FSIS officials declined to adopt Munsell's recommendations.

Roughly five months later, on January 28, 2002, FSIS alerted Munsell that a ground beef sample taken from MQF's facilities five days prior tested positive for *E. coli*

contamination. *Id.* ¶ 21, JA 21. Munsell voluntarily agreed to recall 270 pounds of ground beef he had provided to customers. *Id.* MQF was also required to reassess its HACCP and submit to 15 days of sampling of its products. *Id.* ¶ 22, JA 21-22.

Two days later, Munsell asked FSIS officials to test unopened chubs of beef that MQF had on hand from the two firms that had supplied the coarse ground beef that had tested positive for *E. coli* on January 28. But FSIS officials declined to test the unopened chubs of beef. *Id.* ¶ 25, JA 22. Based on his fear that a large supplier was distributing contaminated beef, Munsell began segregating his meat by supplier, to more readily facilitate traceback to identify the source of any new contamination. *Id.* ¶ 26, JA 22-23. Shortly thereafter, Munsell complained to Nathaniel Clark, the District Office Manager of the Minneapolis office of the FSIS, about how FSIS was handling the *E. coli* outbreak, and reiterated his belief that procedures needed to be put in place to traceback contaminated meat found at small processors. An FSIS official continued taking samples of MQF's meat between February 19 and 21, 2002, and again found *E. coli* contamination. Based on his earlier segregation of meat by supplier, Munsell determined that the source of the contamination was a large supplier, ConAgra. *Id.* ¶ 26, JA 23. The next day Munsell requested FSIS officials to test an unopened chub – before it passed through MQF's facility – to confirm that ConAgra was the source of the contamination. FSIS officials refused. *Id.* ¶ 27, JA 23.

During the month of February 2002, Munsell also communicated with congressional officials concerning his own plant and his fears of an *E. coli* threat at a large meat processor. On February 7 and 8, Munsell contacted the offices of Senator Max Baucus and Congressman Denny Rehberg of Montana to express his concerns. *Id.* ¶ 31, JA 24. On February 8, Senator Baucus and Congressman Rehberg sent a letter to Nathaniel Clark, expressing Munsell's concerns and suggesting that Clark

hold a meeting with Munsell in order to address them. Letter from Senator Max Baucus and Congressman Denny Rehberg to Dr. Nathaniel Clark, District Manager, FSIS (Feb. 8, 2002), JA 201-02. On February 25, Munsell informed congressional staff that he could verify that the *E. coli* contamination found at MQF was brought into his plant from a large supplier. He expressed concern that large amounts of unprocessed beef could be distributed across the country, potentially leading to consumer illness and death. Am. Compl. ¶ 32, JA 25.

Munsell alleges that FSIS inspectors then took retaliatory action against him. Clark contacted Munsell on February 26, 2002, to notify him that FSIS planned to suspend inspection of MQF's facilities. *Id.* ¶ 40, JA 27. The next day FSIS issued a formal Notice of Intended Enforcement to Munsell. *Id.* On March 5, 2002, an FSIS official notified Munsell that his proposed corrective action of insisting that large plant suppliers provide MQF with "certification for pathogen free beef" had been rejected, and that the FSIS had decided to move forward with the enforcement action. *Id.*

On March 8, 2002, facing the prospect of having FSIS inspection suspended, Munsell proposed a regime of sampling and laboratory analysis of incoming beef. On March 12, 2002, with this costly measure in place, Clark informed Munsell that FSIS would hold MQF's suspension in abeyance – meaning that inspections would continue to be carried out. *Id.* ¶ 41, JA 27-28. With the suspension in abeyance, however, the formal hearing appeals process described in 9 C.F.R. § 500.5(d) was foreclosed.

Between February 26 and July 1, 2002, FSIS required MQF to rewrite its HACCP plan on at least ten separate occasions. Am. Compl. ¶ 43, JA 28. Munsell alleges that these demands for revised plans sometimes came from the agency without explanations, that FSIS rejected revised plans that MQF had drawn verbatim from the guidance of USDA officials, and that FSIS rejected plan revisions that had previously been approved.

*Id.* Eventually, MQF was forced to hire expert consultants to usher the HACCP process to conclusion and approval. *Id.* Munsell alleges that, from February 26 to July 3, 2002, due to FSIS's misconduct, MQF was unable to grind its own beef, *i.e.*, beef not purchased as chubs from large plants.

While the HACCP rewrite process was underway, Munsell continued to complain about FSIS's actions towards him, as well as the general way in which *E. coli* contamination was being handled. On March 21, 2002, Montana congressional delegation staff and Munsell held a conference call with FSIS Associate Deputy Administrator for Field Operations William Smith to seek resolution of Munsell's concerns. Decl. of John W. Munsell ¶ 23, JA 192. At that meeting, Munsell complained to FSIS about its decisions to initiate enforcement actions against MQF, reject MQF's HACCP revisions, and require MQF to conduct testing and analysis of incoming beef in order to have the suspension of inspectors held in abeyance. *Id.* On May 3, 2002, Munsell met with FSIS management in Minneapolis to complain of the actions taken against MQF. *Id.* ¶ 24, JA 192-93.

Munsell's concerns about *E. coli* contamination at ConAgra were borne out. On June 30, 2002, ConAgra announced a recall of 350,000 pounds of contaminated beef. Am. Compl. ¶ 37, JA 26. Munsell's conflict with USDA was not over, however. The next day he again communicated to USDA staff his displeasure with "USDA's continuing rejection of my HACCP plan revisions." Decl. of John W. Munsell ¶ 25, JA 193. Notwithstanding a letter dated July 22, 2002, in which Smith stated to members of Congress that "the concerns raised by Mr. Munsell have been satisfactorily addressed," *id.* ¶ 26, JA 193, Munsell continued to press his complaints, emailing FSIS officials in October 2002 and lobbying Senator Conrad Burns to hold congressional hearings on his concerns. *Id.* ¶ 27-28, JA 194.

On March 31, 2004, FSIS revised Directive 10,010.1, which governs how FSIS officials handle *E. coli* sampling. FSIS Directive, 10,010.1 Revision 1 (Mar. 31, 2004), JA 156-83. On October 13, 2004, Munsell and MQF filed suit in the District Court. AAMP was later added as a plaintiff. All appellants sought injunctive and declaratory relief against USDA under the APA. In addition, Munsell and MQF sought damages against an individual FSIS officer, District Manager Clark, under a *Bivens* theory of liability.

After initiation of this suit, Munsell divested MQF of its meat processing facility, and Munsell/MQF were no longer subject to USDA regulation and oversight. Decl. of Cheryl A. Hicks, ¶ 12, JA 42; Application for Federal Meat, Poultry, or Import Inspection (Aug. 1, 2005) (change of ownership), JA 49-50; Email from John Munsell to Wendy Wirth (July 15, 2005) (authorizing reassignment of MQF's USDA establishment number to new owners), JA 52; Grant of Inspection (Aug. 1, 2005) (updating FSIS grant of inspection to reflect change of owner), JA 54.

## II. ANALYSIS

### A. *Standard of Review*

This court reviews *de novo* the District Court's dismissal of a complaint for lack of subject matter jurisdiction. *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1432 (D.C. Cir. 1995). The District Court's determination that 7 U.S.C. § 6912(e) creates an exhaustion requirement is indisputably a question of law that will be reviewed *de novo*. Because we hold that Munsell/MQF's and AAMP's APA actions are not properly before this court, and that Munsell/MQF's *Bivens* action lacks an essential element, there is no need to apply the abuse of discretion standard to the District Court's findings regarding appellants' exhaustion of administrative remedies. *See Avocados Plus Inc. v. Veneman*,

370 F.3d 1243, 1250 (D.C. Cir. 2004) (stating that the court "review[s] non-jurisdictional exhaustion decisions for abuse of discretion").

**B.** *Exhaustion and Subject Matter Jurisdiction*

The District Court dismissed appellants' claims for lack of subject matter jurisdiction, holding that the exhaustion requirement of 7 U.S.C. § 6912(e) is jurisdictional, and that appellants had failed to exhaust their administrative remedies. We first review *de novo* the question of whether § 6912(e) creates a jurisdictional requirement.

FSIS actions are indisputably subject to review under the APA. 5 U.S.C. §§ 702, 704; *see, e.g.*, *Am. Fed'n of Gov't Employees, AFL-CIO v. Veneman*, 284 F.3d 125 (D.C. Cir. 2002). Although neither Munsell/MQF nor AAMP specifically invoked the APA in their filings before the District Court or this court, the Government recognizes that appellants' actions for declaratory and injunctive relief rested on the APA. Br. for Appellees at 7. "When an aggrieved party [seeking judicial review under the APA] has exhausted all administrative remedies expressly prescribed by statute or agency rule, the agency action is final . . . and therefore subject to judicial review." *Darby v. Cisneros*, 509 U.S. 137, 146 (1993) (internal quotation marks omitted). The question here is whether Congress' enactment of 7 U.S.C. § 6912(e) imposes a *jurisdictional* or *nonjurisdictional* prerequisite to Munsell/MQF's and AAMP's actions and, in either event, whether appellants satisfied the prescribed exhaustion requirements.

In 1994, Congress enacted the Federal Crop Insurance Reform and Department of Agriculture Reorganization Act of 1994 ("1994 Reorganization Act"), Pub. L. No. 103-354, 108 Stat. 3178 (1994). Section 212(e) of the 1994 Reorganization Act – codified at 7 U.S.C. § 6912(e) – states:

> Notwithstanding any other provision of law, a person shall exhaust all administrative appeal procedures established by the Secretary or required by law before the person may bring an action in a court of competent jurisdiction against–
>
> (1) the Secretary;
>
> (2) the Department; or
>
> (3) an agency, office, officer, or employee of the Department.

The District Court construed this provision to impose a *jurisdictional* prerequisite to judicial review and then ruled that it lacked subject matter jurisdiction over appellants' actions because they had failed to exhaust their administrative appeals under 9 C.F.R. § 306.5 before filing suit. The District Court erred in reaching this result.

First, we note that the appeals procedures prescribed by 9 C.F.R. § 306.5 relate solely to disputes over enforcement actions, not to disputes of the sort emanating from AAMP's challenge to USDA regulatory policies. The Government cites no "appeal procedures established by the Secretary" to address AAMP's action for declaratory and injunctive relief on behalf of its members. Therefore, AAMP is not subject to the strictures of 7 U.S.C. § 6912(e) and its action should not have been dismissed on exhaustion grounds.

The actions filed by Munsell/MQF must be viewed through a different lens, however, because it is clear that many of their claims relate to USDA enforcement actions taken against the company. In other words, there is no doubt that Munsell/MQF were bound by 7 U.S.C. § 6912(e) and therefore subject to the administrative appeals requirement under 9 C.F.R. § 306.5. The only question is whether the statute imposes a *jurisdictional* requirement which determines subject matter jurisdiction. This is an important question, because a mandatory exhaustion

requirement may be excused in appropriate circumstances, whereas a jurisdictional exhaustion requirement never may be excused by a court. *See, e.g.*, *Woodford v. Ngo*, 126 S. Ct. 2378, 2392 (2006) (holding that the Prison Litigation Reform Act ("PLRA") "exhaustion requirement is not jurisdictional"); *id*. at 2393 (Breyer, J., concurring in the  judgment) (explaining that in nonjurisdictional exhaustion cases, the rules of administrative law contain "well established exceptions" to mandatory exhaustion requirements).  We need not decide whether the "well established exemptions" to nonjurisdictional exhaustion requirements, *id*., apply to § 6912(e), because we hold that Munsell/MQF's claims for declaratory and injunctive relief fail on other grounds.

The Supreme Court has noted that courts sometimes "confuse[] or conflate[]" two distinct concepts:  "federal-court 'subject matter' jurisdiction over a controversy" and the "essential ingredients of a federal claim for relief." *Arbaugh*, 546 U.S. at 503.  The jurisdiction of the federal courts is limited by the Constitution and statutes of Congress.  U.S. CONST. art. III, §§ 1, 2.  A federal court must have not only jurisdiction over a live controversy between parties who are properly before the court, but the case must concern a "subject matter" with respect to which a federal court is competent to rule. *See Arbaugh*, 546 U.S. at 506.  While Congress has the power to describe and circumscribe the jurisdiction of the federal courts, not every threshold requirement is jurisdictional.  In other words, not every statutorily prescribed "ingredient-of-claim-for-relief" reflects a requirement of  "subject-matter jurisdiction." *Id.* at 511.    Thus, where congressional statutes create explicit threshold requirements, courts must determine whether those requirements are jurisdictional or merely elements of the underlying claim.  "If the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue." *Id.* at 515-16

(footnote omitted). "But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character." *Id.*

In the case of the 1994 Reorganization Act, Congress created a threshold requirement that plaintiffs exhaust administrative remedies before bringing an action in court. There is no doubt that this statutory requirement is mandatory, but there is also nothing to indicate that Congress meant to make the requirement jurisdictional. Under established precedent, we must assume that an exhaustion requirement is nonjurisdictional unless we find "sweeping and direct statutory language indicating that there is no federal jurisdiction prior to exhaustion." *Avocados Plus*, 370 F.3d at 1248 (internal quotation marks and citations omitted). Absent a clear direction from Congress, "the exhaustion requirement is treated as an element of the underlying claim." *Id.*

For several reasons, we hold that the exhaustion requirement in the 1994 Reorganization Act is nonjurisdictional. First, it is noteworthy that the language of 7 U.S.C. § 6912(e) is very similar to the statutory exhaustion requirement under the PLRA. The relevant provision of the PLRA provides:

(a) Applicability of administrative remedies

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). As noted above, the Supreme Court found this provision to be nonjurisdictional. *See Ngo*, 126 S. Ct. at 2392. This court did so as well before the Supreme Court issued its decision in *Ngo*, noting that the PLRA exhaustion requirement did "not contain the type of sweeping and direct language that would indicate a jurisdictional bar rather than a

mere codification of administrative exhaustion requirements." *Ali v. District of Columbia*, 278 F.3d 1, 5-6 (D.C. Cir. 2002) (internal quotation marks and citation omitted).  We view these precedents as compelling in our assessment of 7 U.S.C. § 6912(e).

Second, we also find it noteworthy that every other circuit that has directly considered whether the 1994 Reorganization Act creates a jurisdictional exhaustion provision has found that 7 U.S.C. § 6912(e) is nonjurisdictional.  *See Dawson Farms, LLC v. Farm Serv. Agency*, __ F.3d __, 2007 WL 2998636 (5th Cir. Oct. 16, 2007); *Ace Prop. & Cas. Ins. Co. v. Fed. Crop Ins. Corp.*, 440 F.3d 992 (8th Cir. 2006); *McBride Cotton & Cattle Corp. v. Veneman*, 290 F.3d 973 (9th Cir. 2002).  We see no reason to part ways with our sister circuits.

The District Court relied primarily on a Second Circuit decision in *Bastek v. Federal Crop Insurance Corp.,* 145 F.3d 90 (2d Cir. 1998), for authority that § 6912(e) creates a jurisdictional requirement.  *Bastek*, however, did not hold that § 6912(e) is jurisdictional.  Rather, that decision merely held that § 6912(e) was sufficiently explicit to make the exhaustion requirement mandatory.  *Bastek*, 145 F.3d at 94-95*; see also Ace Prop.*, 440 F.3d at 999.  This is not the same as holding that the provision is jurisdictional, because an exhaustion requirement can be both mandatory and nonjurisdictional.  *See Ngo*, 126 S. Ct. at 2392-93.

In sum, we find that the 1994 Reorganization Act did not create a jurisdictional bar to judicial review of USDA actions. Rather, § 6912(e) establishes a mandatory, but nonjurisdictional, exhaustion requirement.  There is no clear, sweeping, or direct language within the 1994 Reorganization Act that would indicate a congressional intent to create a jurisdictional limit on the courts.  Under *Arbaugh* and *Avocados Plus*, absent a clear statement from Congress, exhaustion requirements will be found to be nonjurisdictional.  Accordingly, we reverse the decision of

the District Court and hold that there is subject matter jurisdiction over this case under 28 U.S.C. § 1331.

There still remains a question as to whether Munsell/MQF exhausted their administrative appeals under 9 C.F.R. § 306.5 and thus satisfied the mandatory, nonjurisdictional requirement of 7 U.S.C. § 6912(e). We need not tarry over this question, however. Munsell/MQF had no standing to seek declaratory and injunctive relief to ensure that FSIS officials would not use USDA enforcement powers to retaliate against them in the future. In other words, even if Munsell could establish that agency officials violated his First Amendment rights by retaliating against him in the past, neither he nor MQF demonstrated a real and immediate threat that they would be subject to the same conduct in the future. *See City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). And, as we explain below, Munsell/MQF's remaining actions for declaratory and injunctive relief are moot.

**C.** *Mootness Resulting From MQF's Divestment of its Meat Processing Facility*

"Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). "[F]ederal courts are without power to decide questions that cannot affect the rights of litigants in the case before them. The inability of the federal judiciary to review moot cases derives from the requirement of Art. III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy." *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974) (internal quotation marks and citations omitted). This means that a controversy may become moot if a regulated business challenges a government regulatory policy or action and then terminates its operation during the pendency of the litigation. Normally, once a regulated business has

voluntarily removed itself from the ambit of government oversight, it no longer has a legally cognizable interest in the outcome of litigation that seeks to challenge a government regulatory policy or action. This point was made clear by the Supreme Court in *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278 (2001).

In *City of Waukesha*, the owner of an adult-oriented establishment sought judicial review when the city denied its license renewal application. During the pendency of the litigation, the owner gave notice that it intended to withdraw its licence renewal application and close its business. Citing *City of Erie v. Pap's A. M.*, 529 U.S. 277 (2000), the owner argued that the case should not be dismissed as moot, because the terminated City News business might apply for a license in the future. The Supreme Court ruled that the case was moot, holding that a live controversy is not maintained by speculation that claimant *might* reenter a business that it has left. In reaching this result, the Court carefully limited the holding of *City of Erie*:

> In our view, *Erie* differs critically from this case. In *Erie*, we similarly granted a petition to review a state-court judgment addressing an adult business' First Amendment challenge to a city ordinance. We concluded that the controversy persisted, even though the adult business had shut down. We reached that conclusion, it is true, in part because the business could again decide to operate. That speculation standing alone, however, did not shield the case from a mootness determination. Another factor figured prominently. The nude dancing entrepreneur in *Erie* sought to have the case declared moot after the business had prevailed below, obtaining a judgment that invalidated Erie's ordinance. Had we accepted the entrepreneur's plea, then consistent with our practice when a case becomes moot on review from a state court, we would have dismissed the

petition, leaving intact the judgment below. Thus, had we declared *Erie* moot, the defendant municipality would have been saddled with an ongoing injury, *i.e.*, the judgment striking its law. And the plaintiff arguably would have prevailed in an attempt to manipulate the Court's jurisdiction to insulate a favorable decision from review.

531 U.S. at 283-84 (internal citations and quotation marks omitted). The decision in *City of Waukesha* strongly supports the principle that a case on appeal normally is rendered moot when the appellant closes its business and, as a result, no longer has a cognizable interest in the outcome of the dispute. The *City of Erie* exception applies only when the party who prevailed below attempts to "manipulate the Court's jurisdiction" to avoid having its favorable judgment overturned on appeal. *Id.* at 284.

*City of Waukesha* guides the disposition of this case. In August of 2005, while this case was still pending before the District Court, Munsell divested MQF of its meat processing operation. Decl. of John W. Munsell ¶ 2, JA 185. As a result, Munsell/MQF are no longer subject to USDA oversight. Munsell claims that he anticipates "re-enter[ing] a role in meat processing subject directly to agency regulation." *Id.* But Munsell has offered no clear plans to reopen MQF as a regulated entity. Rather, Munsell essentially claims that the retaliatory actions taken by FSIS officials resulted in his exit from the meat processing business and that a favorable ruling by this court would allow him to return to the industry, and again become subject to USDA oversight. He points out that he has maintained MQF as a corporate entity in good standing, which, he suggests, gives evidence of his desire to return to the meat processing business. *Id.* These claims are insufficient to avoid mootness.

A matter is moot if "events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future."

*21st Century Telesis Joint Venture v. FCC*, 318 F.3d 192, 198 (D.C. Cir. 2003) (internal quotation marks omitted).  As the Court noted in *City of Waukesha*, speculation that a business could again decide to operate, without more, "does not  shield the case from a mootness determination."  531 U.S. at 283.  Because Munsell/MQF are not subject to USDA oversight, a favorable ruling by this court on their APA claims will not affect their rights.  No order from this court is assured more than a speculative chance of giving any relief to these appellants, because Munsell has no definite plans to reopen MQF as a regulated entity.

Munsell/MQF point to the decision in *Supreme Beef Processors, Inc. v. USDA*, 275 F.3d 432 (5th Cir. 2001), in support of their argument that their action for declaratory and injunctive relief is not moot.  In *Supreme Beef,* the court  held that a meat processor's action against USDA was not rendered moot by its subsequent bankruptcy filing, because the business retained a sufficient stake in the case to meet the case or controversy threshold.  *Id.* at 436-37.  Appellants draw on the obvious parallel to the facts of this case – in both instances, a meat processing business failed, allegedly due to regulatory misconduct.  Nonetheless, *Supreme Beef* is easily distinguished from the facts presented here.

Supreme Beef Processors filed for Chapter 11 bankruptcy during the pendency of its action against USDA.  The agency then moved to have the case dismissed on mootness grounds.  In response, the company "argued that it intended to resume operations after reorganization and that the injunction [it sought] . . . was critical to that reorganization."  *Id.* at 436.  The Fifth Circuit denied USDA's motion to remand the case with instructions to dismiss.  Subsequently, the Bankruptcy Court converted the case into a Chapter 7 liquidation.  The company asserted that it had "substantial assets and could emerge solvent from the Chapter 7 liquidation proceedings."  *Id.*  The *Supreme*

*Beef* court held that "[t]he possibility that [appellant] may continue to function as a meat processor even after its Chapter 7 proceeding satisfies Article III." *Id.* at 436-37 (footnote omitted).

The most salient distinction between *Supreme Beef* and the current case is that the appellant in that case had not divested itself of its meat processing facility. While it was possible – as the court recognized – that "Supreme will not . . . emerge from bankruptcy and [will] be dissolved, perhaps during the pendency of any petition for panel rehearing, rehearing *en banc*, or writ of certiorari before the U.S. Supreme Court," *id.* at 437, that had not happened when the court's decision was rendered. As a consequence, Supreme continued to have a legally cognizable interest throughout the litigation. Here, Munsell/MQF are fully divested of their meat processing facility and are no longer subject to USDA oversight. The possibility of dissolution was not sufficient to moot the case in *Supreme Beef*, but the reality of divestment is sufficient here. Munsell/MQF's actions for declaratory and injunctive relief are thus moot.

**D.** *AAMP's Claims for Relief – Mootness, Standing, and Ripeness*

Although the actions filed by Munsell/MQF and AAMP overlap in some respects, they raise different considerations for the court. AAMP appears to press three distinct claims. First, AAMP joins MQF in challenging the enforcement action taken by USDA against MQF. Second, AAMP seeks protection from future acts of retaliation by FSIS officials against its members. Finally, AAMP seeks declaratory and injunctive relief in its challenge to USDA's regulations governing FSIS inspections of small meat processors. The first claim is moot. The second claim fails for want of standing. And the third claim is unripe for judicial review.

Because MQF's challenge to USDA's enforcement actions is moot, AAMP has no basis upon which to pursue this challenge on behalf of MQF. An association has standing "only if . . . at least one of its members would have standing to sue in his own right." *GrassRoots Recycling Network, Inc. v. EPA*, 429 F.3d 1109, 1111 (D.C. Cir. 2005) (internal quotation marks omitted); *see also Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 342-43 (1977). MQF is the only AAMP member that has challenged specific USDA enforcement actions. Therefore, it follows that if AAMP seeks to appear on behalf of MQF to challenge the disputed agency enforcement actions and MQF's claims are moot, then AAMP's claims are moot as well.

AAMP also seeks injunctive relief to ensure that FSIS officials will not use USDA enforcement powers to retaliate against its members in the future. AAMP complains that its members are "concern[ed] that public criticism of the agency can result in" adverse regulatory action. Decl. of Steve Krut, Executive Director, AAMP ¶ 3, JA 209. AAMP offers nothing more than sheer speculation to support the suggestion that its members will be retaliated against by agency officials in the future. In sum, appellants' complaint and accompanying affidavits do not come close to demonstrating that AAMP members face "real and immediate threat[s]" of harm, sufficient to establish the association's standing to pursue this claim. *Lyons*, 461 U.S. at 105.

Finally, AAMP challenges USDA's enforcement policies under FSIS Directive 10,010.1, Revision 1 (Mar. 21, 2004). In particular, the Amended Complaint seeks, *inter alia*, to enjoin any USDA enforcement action based on a determination that a meat processor's HACCP plan is inadequate if "said finding is based in whole or in part on the small plant's failure to sample or test for E. coli at its expense incoming beef products already bearing USDA approval, or to otherwise obtain certification of non-adulteration from the supplying large plant beyond USDA's

approval mark on the beef products supplied," Am. Compl. ¶ 60.1, JA 33; to enjoin USDA "from placing any prohibition on USDA inspectors against sampling for E. coli in beef product supplied by a large plant to a small plant," *id.* ¶ 60.2, JA 33; and to require USDA "to immediately perform a traceback to the supplying large plant, and to implement appropriate and effective corrective action against said large plant," when it obtains information "indicating that E. coli adulterated beef product has been shipped by a large plant to [a small plant]," *id.* ¶ 60.3, JA 33.

AAMP clearly has standing to pursue claims of this sort on behalf of its members, many of whom are subject to USDA oversight and governed by FSIS Directive 10,010.1. The problem here is that AAMP has not raised a facial challenge to any USDA regulation; nor has AAMP petitioned USDA to engage in rulemaking, as allowed by USDA regulations, either to promulgate new rules or to modify FSIS Directive 10,010.1. *See* 7 C.F.R. § 1.28 (making it clear that any interested persons may petition pursuant to 5 U.S.C. § 553(e) for the issuance, amendment, or repeal of USDA rules). When asked about this during oral argument, appellants' counsel advised the court that AAMP's action seeks only to advance an "as applied" challenge to the Directive. Recording of Oral Argument at 13:50-14:12. This is hard to fathom, because AAMP points to no USDA enforcement action against any of its members, except MQF, and MQF's challenge is moot. On this record, we are constrained to find that AAMP's claims are not ripe for judicial review.

The Revised FSIS Directive 10,010.1 appears to reflect USDA's final statement of rules governing FSIS's "Microbiological Testing Program and Other Verifications Activities for *Escherichia coli* 0157:H7 in Raw Ground Beef Products and Raw Ground Beef Components and Beef Patty Components." *See* FSIS Directive, 10,010.1 Revision 1 (Mar.

31, 2004), JA 156-83. The Directive provides FSIS inspection personnel and program investigators with instructions for selecting, collecting, and submitting raw ground beef samples to be tested. It also outlines actions FSIS will take when a raw ground beef product sample is found to be positive for *E. coli*, and it answers questions relating to the reporting of results and actions taken by the agency. *Id.* There is no doubt that the Directive purports to set standards for enforcement actions by FSIS officials. And there is also no doubt that these enforcement actions have a direct effect on AAMP members who are engaged in the processing of ground beef.

It is not altogether clear whether Revised FSIS Directive 10,010.1 reflects a final agency rule that is subject to judicial review, *see Bennett v. Spear*, 520 U.S. 154, 177-78 (1997), or a nonreviewable policy statement, *see Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 800 (D.C. Cir. 2006). *See generally*, EDWARDS & ELLIOTT, FEDERAL STANDARDS OF REVIEW – REVIEW OF DISTRICT COURT DECISIONS AND AGENCY ACTIONS 130-35 (2007) ("STANDARDS OF REVIEW"). We need not address this question, for it is clear here that, in either event, AAMP's claims are not ripe for review.

> Even when an agency has taken final action, a court may refrain from reviewing a challenge to the action if the case is unripe for review. *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158 (1967). The ripeness inquiry springs from the Article III case or controversy requirement that prohibits courts from issuing advisory opinions on speculative claims. *See Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 138 (1974). In other words, if a claim challenging final agency action is not concrete, it may be unfit for judicial review without regard to whether the complaining party has standing to pursue the claim. Normally, no such issue arises in cases in which an agency has taken direct

enforcement action against a party. Rather, the ripeness issue normally arises in cases in which a regulated party faces the *threat* of future agency enforcement action.

STANDARDS OF REVIEW at 119.

In applying the ripeness doctrine, the courts look to "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). In this case, AAMP's action challenging Revised FSIS Directive 10,010.1 is neither fit for review, nor will the association face any hardship if the court withholds review.

In *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158 (1967), an association of cosmetics manufacturers sought declaratory and injunctive relief from an agency regulation that allowed agency officials to immediately suspend a company's government certification if the agency determined that the manufacturer had refused to permit duly authorized inspectors of the Food and Drug Administration free access to all manufacturing facilities. The Court found that there was "no question" that the disputed regulation was final agency action under § 10 of the APA, 5 U.S.C. § 704. 387 U.S. at 162. It also found that the issue presented "a purely legal question" of the type "that courts have occasionally dealt with without requiring a specific attempt at enforcement." *Id.* at 163 (citations omitted). However, the Court concluded that these facts were "outweighed by other considerations," including the fact that the regulation did no more than "serve[] notice . . . that the [agency] *may* under certain circumstances order inspection of certain facilities and data and that further certification . . . *may* be refused to those who decline to permit a duly authorized inspection." *Id.* The Court said that it had "no idea whether or when such an inspection [would] be ordered and what reasons the [agency might] give to justify [any such] order." *Id.* The Court thus dismissed the action as unripe for judicial review. The same

considerations that caused the Court to find the disputed regulation unfit for review in *Toilet Goods* apply as well in this case.

Likewise, we find that AAMP will suffer no "hardship" if judicial review is delayed. In explaining the hardship prong of the ripeness doctrine, the Supreme Court has held that hardship will not be found when a complaining party "is not required to engage in, or to refrain from, any conduct." *Texas v. United States*, 523 U.S. 296, 301 (1998). The Court has also stated "that mere uncertainty as to the validity of a legal rule [does not] constitute[] a hardship for purposes of the ripeness analysis." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 811 (2003). There are no obvious adverse consequences that will flow from requiring AAMP and its members to pursue challenges to the Directive in the context of concrete enforcement actions. In *Toilet Goods*, the Court noted that a regulated party's "refusal to admit an inspector [pursuant to the disputed regulation] would at most lead only to a suspension of certification services to the particular party, a determination that can then be promptly challenged through an administrative procedure, which in turn is reviewable by a court." 387 U.S. at 165 (footnotes omitted). The same reasoning controls here. If USDA seeks to take enforcement actions against any of AAMP's members in the future, those actions will be subject to administrative appeals and judicial review.

The simple point here is that "[w]e have no means to evaluate in the abstract the myriad circumstances that" will arise in connection with USDA enforcement actions taken pursuant to Revised FSIS Directive 10,010.1. *City of Houston v. HUD*, 24 F.3d 1421, 1431 (D.C. Cir. 1994). Indeed, were this court to assess the Directive now, "it would be required to conduct a pseudo-rulemaking proceeding" by examining and weighing all of the considerations that might lead USDA to pursue enforcement actions in the future. *Webb v. Dep't of Health &*

*Human Servs.*, 696 F.2d 101, 107 (D.C. Cir. 1982). Many of the enforcement actions under the Directive are discretionary, so "it is unclear if, when or how the agency will employ it." *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 940 (D.C. Cir. 1986), *vacated on other grounds*, 494 U.S. 1001 (1990). Judicial review of the Directive "is likely to stand on a much surer footing in the context of a specific application of this regulation than could be the case in the framework of the generalized challenge made here." *Toilet Goods*, 387 U.S. at 164. We therefore dismiss AAMP's APA action for declaratory and injunctive relief as unripe.

### E. *The* Bivens *Claim*

In addition to their action seeking injunctive and declaratory relief under the APA, Munsell/MQF also seek damages from Nathaniel Clark, a USDA official who oversaw the disputed enforcement actions against MQF. Appellants invite this court to allow a *Bivens* cause of action in a case such as this, in which it has been alleged that USDA officials pursued retaliatory enforcement actions in order to chill constitutionally protected speech. Appellants' Br. at 26-30.

In *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), the Supreme Court held that a violation of the Fourth Amendment "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct." *Id.* at 389. In that case, agents of the Federal Bureau of Narcotics entered into the petitioner's home and arrested him without a warrant or probable cause. The *Bivens* Court rejected the view that state law causes of action – primarily based on privacy rights – provided a sufficient remedy to protect petitioner's Fourth Amendment interests. Reasoning that Fourth Amendment protections were not limited by state law, that interests protected by state trespass and invasion of privacy laws may be "inconsistent or even hostile" to those protected by the

Fourth Amendment, and that "damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty," the Court held that "petitioner is entitled to recover money damages for any injuries he has suffered as a result of the agents' violation of the Amendment." *Id.* at 390-97.

The Court subsequently applied *Bivens* in other contexts. In *Davis v. Passman*, 442 U.S. 228 (1979), the Court found that the Due Process Clause of the Fifth Amendment created a right of action for damages where a woman had been dismissed from her employment in the offices of a Congressman on the basis of her sex. The Court reasoned that the Civil Rights Act, by excluding legislative employees, did not evidence a congressional intent to foreclose a constitutional damages remedy. 442 U.S. at 247. And in *Carlson v. Green*, 446 U.S. 14 (1980), the Court found that the Eighth Amendment created a cause of action against federal prison officials, complementary to the remedy under the Federal Tort Claims Act against the federal government. 446 U.S. at 19-23. And in *Hartman v. Moore*, 547 U.S. 250 (2006), the Court found that federal prosecutors and postal inspectors who use their powers to retaliate against individuals for engaging in protected speech are "subject to an action for damages on the authority of *Bivens*." 547 U.S. at 256.

In *Carlson*, the Court established two exceptions to the *Bivens* doctrine, stating

> *Bivens* established that the victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right. Such a cause of action may be defeated in a particular case, however, in two situations. The first is when defendants demonstrate special factors counselling hesitation in the absence of affirmative action by Congress. The second is when defendants show that Congress has provided an alternative remedy which it

explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective.

446 U.S. at 18-19 (internal quotation marks and citations omitted). Applying the criteria announced in *Carlson*, the Court has found that *Bivens* actions are barred against federal officers in several contexts. In each of these cases, the Court has found that constitutional damages actions were inappropriate where a sufficient alternative remedial structure already existed.

In *Bush v. Lucas*, 462 U.S. 367 (1983), the Court determined that there was no *Bivens* remedy for a federal employee seeking recovery for First Amendment violations alleged to have occurred in his workplace. The Court summed up the *Bivens* inquiry as follows:

> The federal courts' statutory jurisdiction to decide federal questions confers adequate power to award damages to the victim of a constitutional violation. When Congress provides an alternative remedy, it may, of course, indicate its intent, by statutory language, by clear legislative history, or perhaps even by the statutory remedy itself, that the courts' power should not be exercised. In the absence of such a congressional directive, the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation.

462 U.S. at 378. After reviewing the "elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations," *id.* at 388, designed to redress complaints from federal employees, and weighing "the respective costs and benefits that would result from the addition of another remedy for violations of employees' First Amendment rights," *id.*, the Court declined "to create a new substantive legal liability without legislative aid . . . because we

are convinced that Congress is in a better position to decide whether or not the public interest would be served by creating it." *Id.* at 390 (internal quotation marks omitted).

Applying the standards announced in *Passman* and *Bush v. Lucas*, the Court has found other administrative schemes sufficient to obviate the need for a *Bivens* remedy. In *Schweiker v. Chilicky*, 487 U.S. 412 (1988), the Supreme Court held that the Social Security Act's scheme of administrative and judicial remedies was sufficient to eliminate the need for a *Bivens* remedy. Considering *Bivens* claims on behalf of members of the armed services, the Court has also held that "the unique disciplinary structure of the Military Establishment" constituted a special factor making a *Bivens* action "inappropriate." *United States v. Stanley*, 483 U.S. 669, 679 (1987).

Most recently, in *Wilkie v. Robbins*, 127 S. Ct. 2588 (2007), the Supreme Court affirmed the "familiar sequence" for determining whether to extend a *Bivens* remedy. 127 S. Ct. at 2598. First, the Court analyzed whether an "alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing" a *Bivens* remedy. Second, the Court made a "remedial determination that is appropriate for a common-law tribunal, paying particular heed . . . to any special factors counselling hesitation." *Id.* (internal quotation marks and citations omitted).

In *Wilkie*, petitioner claimed to have been the subject of a multiyear campaign of harassment by government officials – including trespass, unfavorable regulatory actions, and interference in his business operations – carried out to force him to grant an easement to his property. The Court found that petitioner had "an administrative, and ultimately a judicial, process for vindicating virtually all of his complaints." *Id.* at 2600. The Court found, however, that this "patchwork" of state and federal remedies – which included review under the APA –

did not lead to an inference that "Congress expected the Judiciary to stay its *Bivens* hand," and, therefore, the Court engaged in the common-law balancing inquiry. *Id.*

In conducting this inquiry, the Court in *Wilkie* distinguished the case in which a petitioner "describes the wrong . . . as retaliation for standing on his right as a property owner to keep the Government out," from a case in which a petitioner claims that "the Government may not retaliate [against him] for exercising First Amendment speech rights." *Id.* at 2601. The decision notes that in a typical First Amendment retaliation case, the "purpose and motivation" behind the Government's conduct is to chill speech – which is always impermissible. *Id.* On the other hand, in a property rights case of the sort under review in *Wilkie*, the Government was merely "trying to induce someone to grant an easement for public use" which was "a perfectly legitimate purpose." *Id.* The petitioner did not challenge "the object the Government [sought] to achieve." *Id.* And, "for the most part," the petitioner did not claim that the "means the Government used were necessarily illegitimate." *Id.* Rather, the *Wilkie* petitioner simply claimed that Government officials "demanded too much and went too far." *Id*. The Court concluded that "the line-drawing difficulties [created by the petitioner's claims] are immediately apparent," *id.*, and ultimately declined to allow an action under *Bivens*.

It is not entirely clear what the result should be in a case of this sort, involving a claim that FSIS officials used USDA enforcement powers to retaliate against Munsell for statements he made concerning USDA's handling of an *E. coli* outbreak in 2002. The Government argues that the APA provides a sufficient remedy for Munsell, and therefore no *Bivens* action is needed. Br. for Appellees at 25-29. The APA does indeed create a mechanism for persons subject to USDA enforcement actions to pursue challenges based on alleged constitutional violations. *See* 5 U.S.C. § 706(2)(B). In *Nebraska Beef, Ltd. v.*

*Greening*, 398 F.3d 1080 (8th Cir. 2005), the court held that APA review is thus a viable alternative sufficient to bar a *Bivens* remedy against USDA enforcement officials. Observing that "[t]he Supreme Court has been wary of extending *Bivens* remedies into new contexts," 398 F.3d at 1084, the *Nebraska Beef* court held that, "[w]hen Congress has created a comprehensive regulatory regime, the existence of a right to judicial review under the APA is sufficient to preclude a *Bivens* action." *Id.*

The Eighth Circuit decision in *Nebraska Beef* leaves some weighty issues unanswered. The decision was rendered before the Supreme Court issued *Wilkie*. This is noteworthy, because, rather than apply the traditional common-law balancing inquiry endorsed by *Wilkie*, *Nebraska Beef* applies the Eighth Circuit's "presumption against judicial recognition of direct actions for violations of the Constitution by federal officials or employees." *Id.* (quoting *McIntosh v. Turner*, 861 F.2d 524, 526 (8th Cir. 1988)). In addition, the constitutional wrong that the plaintiff sought to remedy in *Nebraska Beef* is unclear. We do not know whether the alleged misconduct in *Nebraska Beef* was motivated by a "legitimate purpose" as in *Wilkie* or involved a First Amendment retaliation claim of the sort at issue in this case. *Cf. Hartman*, 547 U.S. at 256. Finally, we are unaware of any Supreme Court decision holding that APA review *alone* is sufficient to eliminate the need for a *Bivens* remedy.

The Government argues that, "[e]ven apart from the mechanism that Congress has provided for reviewing constitutional challenges to FSIS action, special factors would preclude the creation of a damages remedy against the officials charged with protecting the nation's meat supply." Br. for Appellees at 29. The Government's "special factors" argument is not without force:

> [T]he Federal Meat Inspection Act was passed after Upton Sinclair's book, THE JUNGLE, exposed the unsanitary

conditions in the meat packing industry. A system of federal inspection was created and the inspectors subjected to strict regulation lest their corruption – or the appearance of it – undermine the quality of meat or the public's trust in their supervision of meat quality. The Federal Meat Inspection Act ["FMIA"] provided that the federal inspectors shall have access to all parts of a plant at all times, and included a broad anti-gratuity provision forbidding officers or employees authorized to perform duties under the FMIA from accepting gratuities.

Congress was thus at pains to shield the decisions of federal food safety officials from improper influence by the meat processing plants they regulate. The threat of a damages action can influence an official's conduct as much, if not more, than the temptation of a gratuity, since such a threat can be used by an unscrupulous plant to inhibit aggressive regulation.

Where, as here, federal officials administer a comprehensive federal regulatory regime in which relationships between the regulator and the regulated are frequently hostile and adversarial, it is for Congress to decide whether the public interest would be furthered by a cause of action requiring regulators to pay damages personally unless they can convince a jury that their conduct in aggressively regulating was not the product of an unconstitutional motive. Congress's failure to expose federal food safety officials to personal liability cannot be deemed inadvertent. Accordingly, a court may not imply such a remedy . . . .

Br. for Appellees at 29-31 (internal citations and quotation marks omitted).

Even assuming, *arguendo*, that the existence of APA review might factor into a determination as to whether a *Bivens* remedy

is available, its relevance would be minimal in a case involving claimants who are ineligible for relief under the APA. Because appellants such as Munsell/MQF are no longer subject to USDA oversight, their claims under the APA are moot. The only viable relief for appellants like Munsell/MQF, who allegedly have been driven from business by the retaliatory actions of agency officials, would be backward-looking damages claims. Munsell/MQF allege that USDA officials engaged in a series of enforcement actions with the purpose of harassing Munsell for his constitutionally protected speech. Appellants argue that these officials, animated by retributive animus, ultimately succeeded in driving Munsell/MQF out of the meat processing business. Thus, in a case of this sort, were the possibility of APA review deemed sufficient to foreclose a *Bivens* remedy, the very success of the unconstitutional conduct in removing Munsell/MQF from the regulated arena would make APA review unavailable and insulate the conduct entirely from judicial review. That would make little sense.

While appellees seem to imply that the Supreme Court has abandoned *Bivens*, and that no situation merits its extension, this is not a view that the majority of the Supreme Court has accepted. While some Justices have expressed the view that *Bivens* is a "relic," *Wilkie*, 127 S. Ct. at 2608 (Thomas, J., joined by Scalia, J., concurring) (internal quotation marks omitted), the Court continues to use the "familiar" common-law balancing test, paying special heed to "special factors counselling hesitation." *Wilkie*, 127 S. Ct. at 2598. Under that analysis, while there are considerations here militating against a *Bivens* action – including the § 6912(e) exhaustion requirement, and the "special factors" cited by the Government – the fact that companies may be driven from a regulated arena and then have no recourse for alleged unconstitutional conduct of federal officials weighs heavily as well.

We need not now decide whether to extend the *Bivens* remedy to the current case. Even assuming, *arguendo*, that appellants might have a *Bivens* action, they have failed to exhaust their administrative remedies on their constitutional claims. Just as the PLRA exhaustion requirement applies to *Bivens* actions against prison officials, *see Porter v. Nussle*, 534 U.S. 516, 524 (2002) (under PLRA, "federal prisoners suing under [*Bivens*] must first exhaust inmate grievance procedures"), 7 U.S.C. § 6912(e)'s express language makes it clear that judicial review is only available to appellants like Munsell/MQF after all administrative remedies have been exhausted.

There is a strong rationale for requiring constitutional claims against USDA to be raised first in the administrative process, as mandated by § 6912(e). In *Bivens* actions, plaintiffs typically claim that government officials have exceeded the scope of their authority and, in doing so, violated rights protected by the Constitution. Bringing such claims to the agency in the first instance allows the agency to clarify its position about the conduct of the accused official. *Cf. Wilkie*, 127 S. Ct. at 2601. In these fact intensive cases, an administrative process will also create a record on which a *Bivens* claim can be evaluated. Bringing the complaint directly to the agency also may allow the agency to remedy the alleged offending conduct and, at the least, avoid continuing constitutional harm.

The administrative process in this case is not burdensome. 9 C.F.R. § 306.5 establishes an extremely straightforward process for appealing the decisions of FSIS officials: "Any appeal from a decision of any Program employee shall be made to his/her immediate supervisor having jurisdiction over the subject matter of the appeal . . . ." Munsell took advantage of that process for his claims that the agency was acting unreasonably by failing to require the traceback of contaminated meat and placing an unjustified burden on small meat

processors. He did not, however, raise his constitutional claims while pursuing challenges to the enforcement action. It would have been a simple matter for Munsell to do this, and it would have given the agency an opportunity to "nip in the bud" any unconstitutional conduct on the part of one of its officers.

The fact that USDA's administrative appeals process does not allow for money damages does not create an exception to the exhaustion requirement. *See Booth v. Churner*, 532 U.S. 731, 734 (2001). The rationale for requiring exhaustion does not depend on the existence of money damages as a remedy. So long as the administrative process offers the possibility of some redress for the alleged unconstitutional conduct – including reprimanding the responsible official and barring similar future conduct – the administrative process can serve its proper function.

Appellants did not submit – either in their complaint or in the affidavits and arguments presented to the District Court, or in their submissions to this court – that Munsell/MQF pressed any constitutional challenge within the administrative appeals process. Nor can the complaint and affidavits reasonably be construed to indicate that it would have been futile for Munsell/MQF to pursue their administrative appeals on their constitutional claims. Therefore, even assuming that there might be a cognizable *Bivens* action in a case of this sort – a matter that we do not decide – appellants' failure to exhaust their administrative remedies is dispositive.

We recognize that appellants were not required to specially plead or demonstrate exhaustion in their complaint. *See Jones v. Bock*, 127 S. Ct. 910, 921 (2007) (holding that failure to exhaust is an affirmative defense under the PLRA). In this case, however, the matter of exhaustion under § 6912(e) was raised in the Government's motion to dismiss before the District Court and then fully addressed by the parties in arguments and affidavits submitted to the trial court. The District Court then

granted the motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), finding that exhaustion was jurisdictional and that appellants' failure to exhaust stripped the court of subject matter jurisdiction. The trial court ruled in the alternative that, even if § 6912(e) did not impose a jurisdictional requirement, there was no basis upon which to exempt appellants from the exhaustion requirement with respect to their *Bivens* claim. 435 F. Supp. 2d at 155. This alternative ruling effectively dismissed appellants' claim pursuant to Federal Rule of Civil Procedure 12(b)(6) ("failure to state a claim upon which relief can be granted"). Although, as noted above, the District Court erred in holding that § 6912(e) imposes a jurisdictional prerequisite to judicial review, we still grant judgment to the Government.

Rule 12(b) states that, if, on a motion to dismiss, "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." FED. R. CIV. P. 12(b). In disposing of the *Bivens* claim on the alternative ground that there was no basis upon which to excuse appellants' failure to exhaust, the District Court considered "matters outside the pleading" and both parties had a "reasonable opportunity to present all material made pertinent" to the motion. The District Court, however, did not convert what was effectively a Rule 12(b)(6) motion to one for summary judgment. This court may, however, characterize the District Court's Rule 12(b)(6) dismissal as a grant of summary judgment under Rule 56 and affirm, so long as we are assured that both sides had a reasonable opportunity to present evidence and that there are no genuine issues of material fact. *See, e.g.*, *Ctr. for Auto Safety*, 452 F.3d at 805. Finding no merit in appellant's claim, we will grant summary judgment to appellee.

In viewing the parties' submissions to the District Court, it is undisputed that Munsell/MQF never exhausted their administrative remedies as required by § 6912(e). Pursuant to our holding that exhaustion under § 6912(e) is an essential element of any *Bivens* action against a USDA official (if such an action exists), we are constrained to dismiss because appellants have failed to state a claim upon which relief can be granted.

### III. CONCLUSION

For the foregoing reasons, appellants' actions are hereby dismissed.

*So ordered.*